IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 5, 2000 Session

## JOE H. PARKS v. GEORGE ESLINGER, ET AL.

**Appeal from the Chancery Court for Maury County**
**No. 90-713      Jim T. Hamilton, Chancellor**

**No. M1999-02027-COA-R3-CV - Filed February 4, 2003**

This second appeal in this dispute involves the trial court's modifications of a special master's report regarding the liabilities of the parties after the dissolution of their partnership. The special master reported that one partner, Mr. Eslinger, owed the other partner, Mr. Parks, $10,051.30. Mr. Parks objected, and the trial court modified the special master's report, awarding Mr. Parks an additional $45,427.04, and ordered that Mr. Eslinger pay the costs of the special master. Mr. Eslinger now appeals the trial court's modifications and award of costs. Because the record does not support the trial court's modifications, we reverse and reinstate the master's findings as amended. We modify the award of the costs of the special master.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Reversed in Part, Modified in Part, and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM C. KOCH, JR., J., joined.

Tom Bloom, Nashville, Tennessee, for the appellants, George and Virginia Eslinger.

Patrick A. Flynn, Columbia, Tennessee, for the appellee, Joe H. Parks.

**OPINION**

I. This Court's Remand

The parties herein, Mr. George Eslinger and Mr. Joe H. Parks, were before this court in this litigation on a previous occasion. The issues raised in this appeal must be viewed in light of this court's previous holdings and direction on remand. Therefore, we repeat herein our 1994 decision in this case:

These parties [Mr. and Mrs. Eslinger and Mr. Parks] formed the C&C Farms Partnership in March, 1988, for the limited purpose of buying, fattening, and selling cattle.

It was agreed that Parks would provide the financing, with Eslinger providing the labor.

In September, 1990, the partnership indebtedness was $214,000.00, including a personal loan of $15,000.00 to Eslinger.

On January 10, 1990, the parties executed an Indemnification and Security Agreement wherein Parks agreed to convey his interest in the partnership to Eslinger in consideration of the Eslingers' discharging the partnership obligations to Middle Tennessee Bank.

The record reveals that Parks kept the partnership records, and that he commingled partnership funds with a personal farm account.

The relationship between the parties became strained, resulting in another agreement, executed September 23, 1990, which provided that the Partnership was terminated, that Parks was to receive all partnership assets, that he would assume all partnership debts, and that Eslinger would hold him harmless on a $30,000.00 debt owing to the bank.

This litigation began when Parks sought a deficiency judgment allegedly for the balance owing the bank which he was required to pay after the cattle were sold. The Eslingers counterclaimed for amounts they alleged Parks had appropriated to his personal use, and demanded a jury.

The Chancellor submitted only one issue to the jury, that being the validity of the September, 1990, agreement, since the Eslingers claimed that Parks had coerced them into signing it. The jury found that Parks had forced and coerced the Eslingers to sign the agreement, and this finding is not questioned on appeal. Accordingly, the September 23, 1990, agreement will not be accorded any validity hereafter.

Before the issue was submitted to the jury, the Chancellor agreed that if the agreement was found to be invalid because its execution was procured coercively, the entire case would thereupon be submitted to a master to take and state an accounting between these parties. After the jury's response, however, and for reasons neither of record nor apparent to us, the Chancellor declined to refer the case to a master.

As a result, we are confronted with the daunting task of reconciling hundreds of transactions involving loans, payments, various credits, purchases and sale of cattle,

feed, supplies and the like. It strongly appears that the judgment entered by the Chancellor that Eslinger is indebted to Parks for $93,735.39, plus attorney fees, makes no allowance for partnerships funds which were deposited to Parks's personal account, but as to this we are unable to say, owing to the absence of a proper accounting.

From a consideration of the entire record, we believe that in the interest of justice the judgment should be vacated (except that the invalidation of the September 23, 1990 agreement is not affected) and that the case should be remanded for the purpose of appointing a qualified special master who will take and state an accounting of partnership affairs. In this connection, the master may utilize the proof already taken, and receive such other evidence as the parties shall tender or the master shall require, and should promptly report his/her findings and conclusions to the Chancellor. These findings and recommendations should also include the allegations of the counterclaim.

*Parks v. Eslinger*, No. 01A01-9401-CH-0022, 1994 Tenn. App. LEXIS 497, at *1-*4 (Tenn. Ct. App. Aug. 31, 1994) (no Tenn. R. App. P. 11 application filed).

## II. Proceedings After Remand

After our 1994 decision, this case lay dormant for some time. Mrs. Eslinger died in November of 1997, and some time thereafter Mr. Eslinger filed a motion to appoint a special master. He later filed a notice of dismissal of this motion, because, according to him, he was concerned about the costs. After Mr. Eslinger's dismissal, Mr. Parks filed a motion to appoint a special master, to which Mr. Eslinger filed a motion in opposition based on the fact that the case had lain dormant for many years and because of the potential costs involved. On September 18, 1998, the court filed an order appointing a special master. The trial court's order appointing a special master states:

The special master is directed to receive such evidence, testimony, exhibits, documentation and other matters that he deems necessary and relevant to a determination of the facts in this cause, and to make an accounting of all records, evidence and other such items of proof as properly presented to him and to present that accounting to this court for final determination within ninety (90) days of entry of this order.

Thereafter, the special master submitted his report to which Mr. Parks objected. A hearing was held to address the issues raised by Mr. Parks. The only witness at the hearing was the special master himself, Mr. Stephen P. High, who is a CPA as well as an attorney.

Mr. High reviewed the procedures he followed in analyzing the transactions affecting the partnership during the relevant time period. He also testified to the specific objections filed by Mr.

Parks and explained his conclusions. In so doing, he made reference to documents and other proof in the record of the earlier trial.

The special master's report was a series of financial or accounting statements prepared by him along with notes regarding his methodology. The summary final accounting between the partners upon dissolution attributes as income into the partnership $97,935.00, proceeds from the final sale of partnership cattle and $40,036.62, representing the net amount of partnership funds which had been deposited into Mr. Parks's Gambill Farms, or non partnership, account.[1] The expenses included $34,283.95 in partnership expenses incurred by Mr. Eslinger and $192,358.16 in partnership debt paid by Mr. Parks. Therefore, the partnership had a total loss of $88,670.49 which was apportioned equally between the parties, with each responsible for $44,335.25. Because Mr. Parks had incurred $54,386.54 in losses, while Mr. Eslinger had paid $34,283.95 in expenses, Mr. Parks was entitled to payment of $10,051.30 from Mr. Eslinger to equalize the responsibility for the partnership losses.

Mr. Parks objected to the findings of the special master in regard to specific items assigned by the master as legitimate partnership expenses incurred by Mr. Eslinger. He also questioned the accounting for the cattle in the partnership herd. He suggested that some of the expenses claimed by Mr. Eslinger were not legitimate, that there was insufficient verification of items, and that partnership cattle was missing and unaccounted for. He requested the court to correct the special master's report to reflect an additional credit to him of $45,427.04.

After hearing the objections to the report, the trial court modified the report and awarded Mr. Parks the $45,427.04 he had requested. The basis for the court's modifications was stated to be the lack of credibility of Mr. and Mrs. Eslinger because "this court heard this case at the trial level which gave the Court an opportunity to observe the witnesses who testified and to assign to said witnesses any degree of credibility they deserved." In addition, the court found that Mr. Eslinger's default on a note also allowed the assignment of noncredibility. The court also used as an example one check made payable to a hauler of hay which included a notation the check was for "hay." The court interpreted this as an attempt by Mr. Eslinger to claim expenses which were not legitimate. Finally, the trial court found that the Eslingers' failure to keep complete records of every transaction at their stockyard, as required by federal law, "goes against their credibility and believability."

---

[1]As directed by this court, the special master reconciled deposits to the account of Mr. Parks's other business, Gambill Farms, money which should have gone into the C&C partnership account, expenditures made from C&C money for Gambill Farms expenses, and C&C expenses paid from Gambill Farms accounts. The report found that $90,588.07 of C&C funds were deposited into the Gambill Farms account; $5,147.60 in Gambill purchases paid from the C&C account; and $58,196.84 in C&C expenses paid for by Mr. Parks or through Gambill Farms. After adjustments, the special master found that the total amount owed to the C&C partnership by Mr. Parks or Gambill Farms was $40,036.62. Mr. Parks did not object to these findings.

III. The Role of Special Master, the Role of the Trial Court, and the Record Herein

This court remanded this case for the appointment of a special master to "take and state an accounting of the partnership affairs." "An account is a detailed statement of the mutual demands in the nature of debit and credit between the parties . . . ." WILLIAM H. INMAN, GIBSON'S SUITS IN CHANCERY § 405 (7th ed. 1988). Among the tasks properly assigned to a special master is that of taking an account. *Id.* at § 251. The procedure is governed by Rule 53 of the Tennessee Rules of Civil Procedure. The trial court's order of reference establishes the scope of the master's duties, but the rule establishes the outer limits of the master's powers:

> The order of reference to the master may specify or limit the master's powers and may direct the master to report only upon particular issues or to do or perform particular acts or to receive and report evidence only, and may fix the time and place for beginning and closing the hearings and for the filing of the master's report. Subject to the specifications and limitations stated in the order, the master has and shall exercise the power to regulate all proceedings in every hearing before him or her and to do all acts and take all measures necessary or proper for the efficient performance of the duties under the order. The master may require the production before him or her of evidence upon all matters embraced in the reference, including the production of all books, papers, vouchers, documents, and writings applicable thereto. The master may rule upon the admissibility of evidence unless otherwise directed by the order of reference and has the authority to put witnesses on oath and may personally examine them and call the parties to the action and examine them upon oath. When a party so requests, the master shall make a record of the evidence offered and excluded in the same manner and subject to the same limitations as provided in Rule 43.03.[2]

Tenn. R. Civ. P. 53.01.

Specific requirements apply to the master's report:

> The master shall prepare a report upon the matters submitted by the order of reference and, if required to make findings of fact and conclusions of law, the master shall set them forth in the report. The master shall file the report with the clerk of the court and, unless otherwise directed by the order of reference, shall file with it a transcript of the proceedings and of the evidence and the original exhibits.

Tenn. R. Civ. P. 53.04(1) (2001).

---

[2]An amendment effective July 1, 1999, changed "Rule 43.03" to "Tennessee Rule of Evidence 103."

The master's report herein begins with a statement of the procedures he used "in verifying transactions which took place from March 16, 1988, through November, 1990 in the venture known as C&C Partnership." First listed among the tasks is "Reviewed all depositions, briefs, and proceedings of the Court." The remaining list of tasks refer to verification of documents which were entered into evidence in the earlier trial. They include such items as tracing checks and deposits listed on a worksheet introduced and testified to at trial, verifying of invoices, and performing a detailed analysis of cattle sales and purchases by tracing and verifying checks, and tracing the number of cattle in the partnership herd by using the Brucellosis Test Report and other documentation. He specifically stated he "[t]raced every check claimed by Eslinger as an unreimbursed expense to the original canceled check and verified that the amount and payee were accurate." At the hearing on the objections, according to the Tenn. R. App. P. 24(c) Statement of the Evidence filed herein, the special master also noted that he had several meetings and telephone conversations with both parties and their attorneys. "During these meetings and telephone conversations, Mr. High was able to verify information contained in the court records and gather additional information as well."

It is the last statement which is somewhat problematic because, to the extent the master received additional evidence, a "transcript of the proceedings and of the evidence and the original exhibits" should have been filed pursuant to Tenn. R. Civ. P. 53.04. Because the master has the responsibility of filing a transcript unless specifically directed otherwise by the order of reference, it is error for the master to fail to file such transcript. *In re Estate of Tipps*, 907 S.W.2d 400, 403 (Tenn. 1995). While the record on appeal includes the entire record from the trial, which was filed by the special master in conjunction with his report, there is no transcript of proceedings before the special master or any other record of additional evidence which may have been presented to the special master.

The failure to file a transcript, however, is not always reversible error. In *In re Estate of Tipps*, in fact, the Tennessee Supreme Court declined to reverse the judgment of the trial court which had approved and adopted the master's report even though no transcript of the proceedings before the master was filed. 907 S.W.2d at 403. That determination was made on the basis that: (1) findings of fact by the master concurred in by the trial court are conclusive on appeal if supported by any material evidence; and (2) the record included a detailed document setting out the work done by the executor whose fees were reduced by the master. The Court found that document "when considered in conjunction with the briefs and arguments of counsel and the other materials in the technical record, . . . fully supports the result reached . . . ." *Id.*

The purpose of the requirement that the special master file a record of proceedings is so that the trial court can review any evidence taken before the master and make independent findings. *Fillers v. Cash*, No. 03A01-9705-CV-00186, 1997 Tenn. App. LEXIS 763, at *5-*6 (Tenn. Ct. App. Oct. 31, 1997) (no Tenn. R. App. P. 11 application filed). Whether the trial court affirms, rejects, or modifies the master's report, there must be material evidence in the record to support the court's findings. *See Glen v. Gresham*, 602 S.W.2d 256, 258 (Tenn. Ct. App. 1980); *Hoppen v. Powell*, No. 43, 1986 Tenn. App. LEXIS 3466, at *7-*8 (Tenn. Ct. App. Dec. 15, 1986) (no Tenn. R. App. P. 11

application filed). That evidence may be found in the transcript of evidence taken before the master, if there is any, additional proof taken by the trial court in ruling on the report, *Rimel v. Fulton*, 564 S.W.2d 364 (Tenn. Ct. App. 1976), or, as here, in proceedings held before reference to the master. The master's failure to comply with Tenn. R. Civ. P. 53.04(1) by filing a transcript and/or record of proceedings before the master is harmless error if there is material evidence in the record to support the master's report. *See In Re Estate of Tipps*, 907 S.W.2d at 403 (citing *Glenn*, 602 S.W.2d at 258).

We find no reference in the master's report, the objections and response thereto, or the trial court's ruling to any evidence or facts that were not presented in the earlier trial, the record of which was considered by the special master and has been filed herein.[3] Neither party objected to the master's failure to file a transcript; neither has raised on appeal the absence of such transcript. Neither has asserted that the master's report was based on evidence not in the record. Instead, it appears the master, the parties, and the trial court relied upon evidence in the trial record. Consequently, the master's failure to file a transcript or any evidence taken before him is harmless error.

Additionally, neither party objected to the manner in which the special master operated; the record contains no such objection or any request for a hearing before the master with sworn testimony. Mr. Parks's objections to the special master's report were specific; he did not object to a great deal of the report. Mr. Eslinger did not file objections to any part of the master's report. The parties have waived any objection to the procedure itself and have waived objection to those portions of the master's report which were not objected to in the trial court. This court has consistently held that "as a general rule a Master's Report unexcepted to below may not be complained of on appeal." *Long v. Long*, 957 S.W.2d 825, 829 (Tenn. Ct. App. 1997) (quoting *Hopkins v. First Tenn. Bank*, 560 S.W.2d 916, 918 (Tenn. Ct. App. 1977)). That rule applies to portions of the report as well as the report as a whole. *Id.*

A party cannot wait until after the trial court has conducted its hearing and ruled on the master's report to raise new objections to the report. *Smith v. Frazier*, 189 Tenn. 71, 78, 222 S.W.2d 367, 370 (1949); *Huntington v. Lumpkin*, 39 Tenn. App. 151, 281 S.W.2d 403, 407 (1954); *Boyd v. Avery*, No. W1999-00599-COA-R3-CV, 2000 Tenn. App. LEXIS 445, at *13-*14 (Tenn. Ct. App. June 27, 2000) (no Tenn. R. App. P. 11 application filed). Although neither party herein has attempted to raise a new objection, we simply point out that our review is limited to those objections made and ruled upon by the trial court.

## IV. Standard of Review

It is well settled that a concurrent finding of a special master and a trial court is conclusive on appeal, except where the appeal involves an issue not proper for referral, where it is based on an

---

[3]An Agreed Order supplemented the record in this appeal with the record of the original appeal. The order stated, "said record was expressly used by the special master and by this Court in deciding the instant case and was filed by the special master with the Court, pursuant to Tenn. R. Civ. P. 54, in conjunction with his report."

error of law or a mixed question of fact and law, or where it is not supported by any material evidence. *In re Estate of Tipps*, 907 S.W.2d at 403; *Manis v. Manis*, 49 S.W.3d 295, 301 (Tenn. Ct. App. 2001); *Long*, 957 S.W.2d at 828; *Aussenberg v. Kramer*, 944 S.W.2d 367, 370 (Tenn. Ct. App. 1996).

In the case before us, however, Mr. Eslinger's appeal is on that part of the master's report that the trial court rejected or modified. Thus, no conclusiveness applies to either set of findings, the master's or the trial court's, on those issues. The applicable rule provides the trial court with various options when ruling on a special master's report:

> The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.

Tenn. R. Civ. P. 53.04(2).

Appellate courts review findings of the trial court which reject or modify a master's findings under the general standard of Tenn. R. App. P. 13(d). *See Manis*, 49 S.W.3d at 304 (stating that a trial judge's modification of a master's finding on alimony is reviewed using the usual standard for such issues). Because Tenn. R. Civ. P. 53.04(2) puts no limitations on the discretion of the court to adopt, modify, or reject in part or in whole the master's report, we will review the trial court's findings on a master's report as we would any other trial court finding. Consequently, our review is *de novo* upon the record, with the trial court's findings of fact accompanied by a presumption of correctness unless the evidence preponderates otherwise.

When the trial court rejects or modifies portions of a master's report, the court is to make its own findings based on its independent review of the evidence. While a trial court is free to reach different findings from those of the master based on the same evidence, and is free to take additional evidence and to base its findings on that, the court's findings must be supported by evidence in the record. The only evidence at the hearing on the report and objections herein was that of the master. Thus, we must look to the Statement of the Evidence from that hearing and to the transcript and exhibits from the original trial to determine if the evidence preponderates against the trial court's findings.

## V. The Partnership and the Lawsuit

Mr. Parks and the Eslingers formed the partnership known as C&C Farms in March, 1998, when Mr. Eslinger learned of the availability of a herd of cattle for $112,500. Because Mr. and Mrs. Eslinger did not have the financial ability to purchase the cattle themselves, they entered into an arrangement with Mr. Parks, who provided the initial purchase price. Mr. Parks borrowed the purchase price through his other business, Gambill Farms. The herd was bought, and the partnership was begun. It was agreed that Mr. Parks would provide the financing and the Eslingers would

provide the labor. Just as Mr. Parks had other business enterprises, so did the Eslingers. During the relevant time, they were partners in or owners of Lewisburg Livestock Auction.

The initial financial transaction was handled through the Gambill Farms Account, but a C&C Farms account was opened with the proceeds from a $20,000 partnership loan in August of 1988. It is undisputed, and this court previously found, that Mr. Parks kept the C&C partnership records and the checkbook throughout the duration of the partnership. The Eslingers never had access to the checking account or the financial records. This court found in the last appeal that Mr. Parks had commingled partnership funds with a personal farm account. We also found it strongly appeared the trial court had not made allowance for these partnership funds used for non-partnership purposes by Mr. Parks. Mr. Parks admitted making deposit of C&C funds into his Gambill Farms account, but maintained that the C&C account and venture was simply carried on his books as an investment account within Gambill Farms.

At the beginning, the cattle were kept on a large farm outside of Mooresville. Mr. Parks testified that the original intention was to run the cattle for 60 to 90 days and then sell them off or sell the calves off. However, in May through July of 1988, the weather was very dry, and the partnership was required to rent another farm closer to Columbia to support part of the herd. They also had to make unanticipated purchases of feed and hay. They had a number of one-time expenses early in the partnership including fencing, buying feeders, and repairing a well pump. Because one of the farms they rented had not been used recently, the Eslingers had to clear the area of debris and bushhog it to make it usable for the cattle. They made nightly trips to feed the cattle and regular trips to check on them.

They did sell some calves early in the venture, and Mr. Parks deposited the proceeds to his Gambill Farms account because the C&C account did not exist yet and because the original loan had been made to Gambill Farms. With the proceeds, he reduced the principal on that loan to $86,000. The partnership was required to obtain additional loans at various points. Although the initial agreement was for Mr. Parks to provide the financing, that arrangement was modified. Because of the unanticipated expenses at the beginning, Mr. Eslinger told Mr. Parks the Eslingers could not continue to pay for the expenses. The partners obtained a $20,000 partnership note and opened the checking account. Mr. Eslinger was reimbursed a portion of his expenses at that point. As the partnership continued, the Eslingers signed notes and note renewals on behalf of the partnership jointly with Mr. Parks, including renewals of the remaining principal on the initial note which was used to buy the herd. Mr. Eslinger explained the partners' arrangement, "We were going to either use the proceeds of sales of cattle to pay expenses from then on, or we would borrow the money. From then on we both signed the notes."

The Eslingers testified extensively about the labor they contributed to the care of the cattle. In addition, they testified about the many types of expenses they incurred: fuel for the truck, feed for the cattle, costs of hauling hay, feed, and cattle, hydraulic fluid for the tractor, etc. The Eslingers received two payments for their expenses in 1988, one for $5,000 and one for $1,500, although they turned in receipts to Mr. Parks for expenses exceeding the amount received and had incurred even

more in expenses. Mr. and Mrs. Eslinger testified that whenever they asked for reimbursement thereafter, they were told there was no money in the account. Mr. Parks testified that he reimbursed the Eslingers for any expenses they claimed. Some expenses were being paid directly out of the C&C account by Mr. Parks. Part of Mr. Parks's objections to the unreimbursed expenses claimed by the Eslingers was that they had not asked him previously for reimbursement. Mr. Parks stated he was aware that Mr. Eslinger had spent money on the cattle, but he believed Mr. Eslinger would have presented him with a bill promptly after any such expenditures.

The partnership continued to purchase additional cattle and to incur expenses. A number of cattle sales also occurred during the partnership. Some of the proceeds were deposited into Mr. Parks's Gambill Farms account instead of into the C&C account. Mr. Parks testified that he had wanted to get out of or dissolve the partnership as early as 1989, because he was convinced it was a losing proposition and was ready to cut his losses. He stated that Mr. Eslinger asked him to continue on so they could recoup any losses and make a profit.

By January of 1990, the partnership's indebtedness to the bank had reached $214,000. According to Mr. Parks, notes were coming due, and his assessment was that the total indebtedness of the partnership was greater than the value of the cattle owned. Mr. Parks wanted out, and in January of 1990, he took action to get out of the partnership. He and the Eslingers executed documents, an Indemnification and Security Agreement and a Security Agreement in the amount of $214,000. The effect was that the Eslingers were to hold Mr. Parks harmless on the notes from Middle Tennessee Bank and Mr. Parks would convey his interest in the partnership to the Eslingers.[4]

The Eslingers testified they signed the documents because they did not think they had a choice. They also reasoned that if they got the partnership assets, the herd, the equipment, and the partnership account, they could make the venture profitable. Based on what she knew at the time,[5] and assuming that all proceeds from prior cattle sales had been deposited in the C&C account and that the Eslingers would receive the account, Mrs. Eslinger thought $199,000 was a fair price for the partnership assets.

After the January 1990 agreement, the Eslingers considered themselves "on their own" with the cattle venture. Consequently, they did not request reimbursement from Mr. Parks for expenses they incurred. They continued what they had been doing in terms of taking care of the cattle. They bought cattle for the C&C herd and paid for the cattle themselves. They had started with an initial

---

[4]Under the Indemnity Agreement, the Eslingers promised "to make all the payments on the obligations or any renewals thereof" and to indemnify Mr. Parks from loss resulting from the obligations. The Security Agreement pledges the herd of cattle and prevents the sale of cattle without the written consent of Mr. Parks. As explained later, a number of sales of cattle occurred after this agreement, and the proceeds were put into the partnership account which Mr. Parks controlled.

[5]The January agreement listed the number of cattle in the herd as 225. Mr. Parks testified this was the number agreed to. Mrs. Eslinger testified she knew the number was wrong at the time, but was advised she could not challenge it because Mr. Parks had all the records. The original herd had 228 animals.

herd that had not been in good condition, and the Eslingers were attempting to improve the herd by selling off those whose condition was not going to improve, keeping younger ones, and taking care of cows during pregnancy which resulted in healthy calves. They intended to develop a herd with dependable "crops" of calves which they could sell. By September of 1990, the Eslingers felt they had improved the herd and were preparing for a sale of calves in September.

Although the Eslingers continued to take care of the cattle and to buy cattle for the herd, the parties' conduct after the January 1990 agreement indicates a lack of a clear understanding between them about the status of the agreement or the status of the partnership. For example, the Eslingers made a number of sales of C&C cattle after January 1990. The proceeds from those sales were deposited into the C&C account. The Eslingers never had access to the account, bank statements, or the checkbook. Mrs. Eslinger stated that after the agreement, contrary to their expectations, the Eslingers "discovered they were not going to have access to the checking account and that any proceeds from the sale of cattle were going to go into the account." How this discovery came about is not clear, but the record demonstrates that is exactly what happened.

Mr. Parks's accountant provided records showing credits to the C&C account for sales of cattle from February 1990 through the termination of the partnership. Those records also show payment for some regular expenses, such as farm rent, supplies, hauling, etc. out of the C&C checking account. These expenses were in addition to the expenses the Eslingers were incurring personally without reimbursement. There were no payments out of the C&C account for the purchase of cattle after the January 1990 agreement.

The Eslingers testified that they knew they could not renew the partnership debts alone and began to look for other financing. The Eslingers testified that while they were attempting to secure financing for the entire partnership debt, they paid interest on the partnership notes after January 1990. They testified that they paid all interest that was due and/or renewed the notes.

According to the Eslingers, Mr. Parks would notify them if notes or interest payments were due. They never had any direct contact or notice from the bank. This process was confirmed by the bank's representative who stated the bank would notify Mr. Parks when a note needed to be renewed. Mr. Parks and the Eslingers would come to the bank separately and sign the renewal notes. The Eslingers testified that as soon as they were notified that renewals were prepared, they went to the bank and signed them. They never received any notice from the bank or Mr. Parks that they were in default on interest payments or notes. Because they were never given the C&C checkbook, they made the interest payments out of their personal funds.

Mr. Parks testified that he did not believe that the Eslingers paid every interest payment due on the partnership note after the January 1990 agreement "except through the C&C Farm," although he does not dispute that the Eslingers never had the checkbook or access to the account. The record indicates that two interest payments were made to Middle Tennessee Bank from the C&C account during the relevant time period: one for $11,273.44 on June 13, 1990, and one for $4,409.81 on

August 23, 1990. The record also indicates that the Eslingers made interest payments totaling $4,164.02 on March 5, 1990.

The record also shows that the partnership loans were renewed and consolidated by Mr. Parks and the Eslingers after January 1990. As of March of 1989, the principal indebtedness of the partnership was $214,000. Notes for $40,000 and $30,000 were renewed in August of 1989 with a due date of February 16, 1990; a note for $70,000 combining these two loans was signed on June 13, 1990, with a due date of August 12, 1990. That loan was renewed on August 17, with a due date of October 15, 1990. Two other notes were renewed on August 17, 1990, with due dates of October 15, 1990. One was for $86,501.51, representing the balance on the original note to purchase the herd, which had been renewed a number of times, the latest renewals occuring in November of 1989 and June of 1990. The third note was for $57,500, which had been renewed in October of 1989, with a due date of April 27, 1990, and again on June 13, 1990, with a due date of August 17, 1990. The borrower on all the renewal notes was reflected as Joe Parks and George Eslinger d/b/a/ C&C Farms, and all were signed by Mr. Parks and Mr. and Mrs. Eslinger.

The Eslingers attempted to secure financing to pay off the partnership's debt. They went to Farm Credit Services and applied for a loan. Mr. Eslinger was told he needed more verifiable income, so he returned to his earlier career as a long distance truck driver in July of 1990. By this time, they had the herd on only one farm, and, according to their testimony they had developed a young and healthy herd. They intended to sell some calves in September and use the proceeds of that sale and the fact that regular sales of calves could be anticipated to demonstrate their ability to repay a loan. On September 20, 1990, they sold a group of calves. The proceeds, $19,329.03, were deposited to the C&C account. They had another group of younger calves and a number of cows who were pregnant. Mr. Parks participated in rounding up the calves for sale and the other cattle for testing.

Thus, as of September 1990, although the Eslingers made some interest payments on the C&C indebtedness and had jointly renewed partnership loans, they had not assumed the partnership obligations. Mr. Parks never actually conveyed his interest in the partnership or delivered the partnership account, assets or records. He testified that he considered the January agreement to have been ineffective, having never been fulfilled. Mr. Parks testified that he would have considered the January agreement to take effect "when the notes were paid off and my name was off the notes." The parties' conduct after January 1990 shows they continued, in many ways, the partnership activities as they had prior to January 1990. Neither party, however, seemed to be aware of the expenses being incurred and paid for by the other.

The final change in the partnership arrangement occurred when a new document was signed on September 23, 1990. This document specifically superceded all prior agreements between the parties. In essence, the arrangement gave Mr. Parks all the partnership assets, except the truck, and the partnership's liabilities, except for $30,000. The Eslingers agreed to hold Mr. Parks harmless with regard to "$30,000 due the Middle Tennessee Bank which was a prior debt of Mr. Eslinger's."

The parties have different interpretations or recollections of the events leading up to the new arrangement.

According to the Eslingers, by September of 1990, they anticipated getting the financing needed to assume the outstanding liability. They felt they were at the threshold of being able to make significant payments on the principal on the notes. Mr. Eslinger had returned to truck driving to show a regular income, and they would be able to show the September 20 sale of calves to demonstrate income from the operation to qualify for financing. According to the Eslingers, the September 20, 1990 sale of calves was part of their plan to undertake the partnership debt and relieve Mr. Eslinger of any obligation thereunder. They were prepared to return to the lending institution immediately after the September 20, 1990 sale of calves.

On the other hand, Mr. Parks testified that the Eslingers had agreed in late summer or early fall of 1990 to end the cattle operation. According to Mr. Parks, Mr. Eslinger agreed to have a sale to sell the entire herd. He stated that the September 20, 1990 sale of calves was part of the plan because they thereby culled the calves in anticipation of the sale of the entire herd, receiving about $19,000 for the calves.

Mr. Parks testified that the parties had set a goal of mid-October for the final sale or auction because they had several notes coming due then. However, he said he precipitated the end of the partnership before the final sale because he had no cooperation from Mr. Eslinger regarding the sale. Mr. Eslinger was by this time traveling in his job and did not return calls as quickly as Mr. Parks thought he should. Because it was approaching the deadline to advertise for the sale if they were going to meet their goal of selling the cattle by the middle of October, Mr. Parks felt it imperative to discuss the details with Mr. Eslinger.

Unable to otherwise reach him, Mr. Parks went to the Eslingers' house on Sunday, September 23, 1990. The parties disagreed at trial as to the events that transpired at that meeting. It resulted in the agreement terminating the partnership by giving Mr. Parks most of the assets and most of the liabilities. As discussed earlier, the jury resolved the conflict in the parties' testimony as to what happened on that Sunday and found that the Eslingers had been coerced into signing away their interest in the partnership assets and agreeing to pay Mr. Parks.

Although Mr. Parks arranged to have the bank prepare the $30,000 note which the Eslingers agreed to undertake in the September 1990 agreement, the Eslingers never signed it. Mr. Parks took control of the herd, and sold 38 animals at a sale in Wilson County on October 19, 1990. The $15,421.89 received in proceeds from that sale was apparently deposited into the Gambill Farms account. A short time later, Mr. Parks's son was notified by the bank that Mrs. Eslinger attempted to withdraw all the money from the C&C account. The banker stated he was just going to have to freeze the account. Mr. Parks went to talk to the banker and asked him to apply the money in the checking account to the note that was due and pay the interest.

Mr. Parks then posted and sent to Mr. Eslinger's attorney a "Notice of Public Sale" of the cattle, stating, "This sale is held to enforce the rights of Joe Parks of Columbia, Tennessee, as the secured party arising under a security agreement executed by George Eslinger as debtor." This was a reference to the January 1990 security agreement, even though Mr. Parks had stated in the September 1990 agreement that earlier agreements were superceded. It was Mr. Parks's position that because the Eslingers had not taken care of the partnership indebtedness, he had a right to sell the cattle owned by the partnership.

No one showed up at the sale except Mr. Parks, his son, and his attorney. Mr. Parks testified that the herd included one hundred twenty-nine cattle; the special master found there were 4 bulls, 32 pregnant cows, 79 cow/calf pairs, 7 cows, and 3 heifers for a total of 204 animals or 125 if the cow/calf pairs are calculated as one animal. Mr. Parks put in a bid of $750 per head, which he thought was $100 to $150 above the market value of these cattle. He bid and purchased the herd for $96,750. The special master later valued the herd at $97,935. Neither party objected to the special master's account of the number of animals in the herd or the value as of the final sale.

Mr. Parks then filed the underlying lawsuit, alleging that the Eslingers had executed an indemnification and security agreement [the January 1990 agreement], that the Eslingers had defaulted on the indemnity, that Mr. Parks had exercised his rights and sold the livestock securing the agreement, and that he was still indebted to the bank. He sought a judgment for a deficiency of $90,800. The complaint alleged in the alternative the parties had executed an agreement dated September 23, 1990, transferring assets and liabilities of the partnership to Mr. Parks and under which the Eslingers agreed to hold Mr. Parks harmless on a promissory note. The complaint alleged that the Eslingers had failed to honor this agreement. As alternative relief, Mr. Parks requested that the Eslingers be required to comply with the September 23 agreement.

The Eslingers answered and denied they had defaulted in any obligations. They denied the validity of any written agreements between the parties because they were coerced into signing them. They asserted Mr. Parks had failed to carry out promises or performance required of him during the partnership, and he breached the January 1990 agreement, even if it were found to be valid. They counterclaimed for compensatory damages, alleged Mr. Parks had converted partnership assets, had interfered with their interest in the partnership assets, and had engaged in outrageous conduct. They sought punitive damages of $250,000.

At trial, the court submitted one interrogatory to the jury, whether Mr. Parks used coercion or force to obtain the Eslingers' signatures on the September 23, 1990 agreement. The jury answered in the affirmative. The Eslingers moved for entry of an order declaring the agreement void and to appoint a special master for an accounting and determination of damages, as had been announced by the trial court earlier. After briefs were filed by the parties, the trial court entered a final order finding: interest payments came due on partnership notes on October 15, 1990, and the Eslingers did

not make those payments;[6] the partnership notes have not been satisfied by the Eslingers; the indemnity and security agreement was valid; Mr. Parks's sale of the herd was commercially reasonable; the partnership was dissolved January 10, 1990; the notes at Middle Tennessee Bank were in default on October 15, 1990; and that the Eslingers were indebted to Mr. Parks for $93,735.39. The trial court awarded that amount as a judgment in favor of Mr. Parks as well as attorney fees. The court found, "Having found that the foreclosure sale was valid, the Court does not refer this case to a Master to take an accounting on the assets of the partnership."

This court, "in the interest of justice," vacated all of the trial court's judgment except the voiding of the September 23, 1990 agreement. We remanded the case solely for the purpose of appointing a master to take an accounting of the partnership affairs. Nothing in the record following the remand indicates that the parties or the trial court considered there to be any issues to be decided other than an accounting of the partnership and the liabilities between the parties upon the termination of the partnership. The trial court was not asked to make any rulings except upon the objections to the special master's accounting.

Consequently, the only issues involved in this appeal are those presented by the special master's report, the objections thereto, and the trial court's final judgment. Although the parties continue to argue that the other is at fault for the demise of the partnership, for the losses incurred, or for misuse of partnership assets, and make reference to the agreements, none of those issues is before us. The partnership was terminated and its assets disposed of. Under this court's prior ruling, the only task left was to figure out what had transpired financially during the partnership and to allocate responsibility for any losses: an accounting of the partnership finances or, because the partnership was dissolved, a detailed statement of the amounts owed or due each partner.

## VI. The Objections and the Evidence

The trial court made three modifications to the special master's report, granting Mr. Parks's objections in their entirety.

---

[6]To the extent this is the default on which the trial court later hinged its credibility determination, some discussion is required. In the final order on appeal herein, the trial court simply stated, "These same Defendants defaulted on a noted at Middle Tennessee Bank in the amount of some Ninety-four Thousand Dollars ($94,000) which the Plaintiff had to pay." Mr. Parks's original complaint for a deficiency judgment was based upon the Eslingers' failure to pay partnership notes due October 15, 1990. Of course, by that time, the September agreement had been executed giving Mr. Parks sole obligation for the partnership debt except for $30,000. There is no evidence in the record that the bank ever notified the Eslingers that a payment was due or that they were in default. The January security agreement, on which Mr. Parks hinged his right to sell the herd, only required the Eslingers to make interest payments and/or renew notes. Interest payments were made by the Eslingers and by C&C, through the partnership account, from proceeds of cattle sold after the January 1990 agreement. As of October 15, 1990, Mr. Parks had control of the herd and the partnership account into which the proceeds from the September sale of calves had been deposited.

## A. Operational Expenses

The special master's report includes a page entitled "Reconciliation of Expenses and Reimbursements - Eslingers." That page refers to exhibits introduced at trial. The special master listed the claimed expenses by trial exhibit number, the amount shown on the exhibit, and the amount he was able to verify. He verified $56,608.10 in cattle-related expenses and $4,349.24 in expenses on a truck used by the Eslingers for both personal and partnership purposes. After deducting reimbursements and making other adjustments, he determined that the amount owed to the Eslingers from the partnership was $34,283.95.

Mr. Parks's motion objecting to the master's report asked the court to disallow $20,031.97 in expenses, evidenced by checks and invoices attached to the motion, which Mr. Parks claimed were lacking in verification. His motion more particularly describes the expenses as:

$5,231.89 - 1988 Eslingers' expenses without notation as partnership expense;
$3,748.09 - 1989 Eslingers' expenses without notation as partnership expense;
$6,719.30 - 1990 Eslingers' expenses without notation as partnership expense;
$2,974.07 - 1989 Expenses for the Nissan truck;
$  911.58 - 1990 Expenses for Nissan truck.[7]

The first category of expenses to which Mr. Parks made objection are non-truck related operational expenses. The objection was originally based on the fact that the challenged checks and invoices did not include a notation indicating the expenses were for C&C Farms. The checks generally include notations for such items as "labor fencing," "farm supplies," "trucking," and the like. In his motion, Mr. Parks framed this objection as an "equal treatment" argument because, he alleged, the special master had allocated to Mr. Parks's Gambill Farms, as opposed to C&C Farms, $5,147.60 in purchases on the basis "there were no identifying notations showing that the materials went to the partnership." Mr. Parks specifically stated that he accepted the master's determination regarding the $5,147.60 in Gambill Farms expenses, but asserted that any invoices or checks claimed as partnership expenses by the Eslingers which did not show a notation "for C&C Farms" or similar indication should also not be allowed. The Statement of the Evidence states:

Regarding the Shapiro [a farm supply store] invoices, in which Mr. Parks asked the court to subject both parties to the same level of scrutiny, Mr. High testified that Mr. Parks and Gambill Farms had a separate account at Shapiro - - - Account #508. C&C Farms' account number was #938. The $5,147.60 in disallowed invoices had Account #508 and either Joe Parks' name and/or Gambill Farms' name written on them. It was noted by Mr. High that testimony in the original trial proved that certain Shapiro invoices were for Gambill Farms supplies.

---

[7]We first note that the total of these amounts is $19,584.93, not the $20,031.97 requested by Mr. Parks and granted by the trial court. Other mathematical errors exist in the figures submitted by Mr. Parks when compared with the backup documentation.

Thus, Mr. Parks's "equal treatment" argument is misplaced. The expenses charged by the special master to Gambill Farms were not disallowed as expenses of the partnership because the documentation lacked a partnership notation; rather, the documentation reflected a specific non-partnership notation. The record supports the master's explanation.

On appeal, Mr. Parks states he has "conceded that invoices referencing C&C Cattle are not easily disproved," but that it is his right or prerogative to question whether payments not so identified may either have been made for Mr. Eslinger's other business or may have been "manufactured" for the trial. Thus, he makes a blanket objection only to those expenses documented by a check or invoice which does not say "C&C Farms."

The checks and receipts contained in the exhibit to Mr. Parks's objections were first introduced during the direct examination of Mrs. Eslinger and appear as trial exhibits in the record. In summary, Mrs. Eslinger's trial testimony was that neither Mrs. Eslinger nor Mr. Eslinger had access to the C&C Farms checkbook and so they paid for things themselves. The Eslingers were reimbursed twice in 1988, but never again thereafter. Mrs. Eslinger testified that when she or Mr. Eslinger asked Mr. Parks to reimburse them, he told them that there was no money in the account to pay them. Mr. Parks testified that at all times he had the partnership checkbook, but stated that Mr. Eslinger never presented him a bill for C&C Farms that he did not pay. Of course, after the January 10, 1990 agreement, the Eslingers would not have asked Mr. Parks to pay for expenses, since he had agreed to convey his interest to the Eslingers. The special master stated that the majority of the claimed expenses were "incurred in 1990 when Mr. Parks was not actively involved in the operations of the partnership."

As a result of the lawsuit brought by Mr. Parks, Mrs. Eslinger made a compilation of expenses for which the Eslingers still had not been paid at the time of trial. She testified that she was very careful to only include C&C Farms expenses in that compilation, which was introduced into evidence along with the checks and receipts.

Mr. High testified that the expenses he approved appeared to be legitimate and reasonably documented and that they were similar in amounts for expenses that were paid through the partnership checking account. He stated that not only were the expenses reasonable compared to those paid by the partnership, but they were also paid to the same vendors and service providers paid by the partnership. Our independent review of the record, including the checks written and the C&C partnership account records, confirms Mr. High's conclusions. Mr. High also testified that certain expenses claimed by Mr. Eslinger were in fact disallowed due to poor or non-existent documentation.

We find no evidentiary basis for either Mr. Parks's ground for disallowance of these operational expenses or for the trial court's modification of the special master's findings regarding these expenses. The Eslingers claimed $59,043.10 in non-truck related operational expenses. The special master verified and included in his accounting $56,608.10 of those claimed expenses. Mr. Parks objected to and the trial court disapproved only a portion of those expenses, $15,699.28.

There is no testimony or other proof in the record which would explain the distinction between those expenses allowed by the court and those disapproved by the court even though payments to the same people or companies are included in both categories.

Mr. Parks offered no citation to any evidence regarding specific expenditures which would indicate they were not properly charged to the partnership. We fail to see how the absence of a notation specifically for "C&C Farms" constitutes sufficient grounds for denial of the expenses. An omission of such notation on some checks and invoices, but its inclusion on others, cannot be the determinative factor in whether the claimed expenses were or were not legitimate expenses of the partnership in view of the testimony.

Similarly, the trial court's disallowance of a portion of the claimed expenses on the basis of its judgment that Mr. and Mrs. Eslinger were not credible does not explain the court's approval of some of the claimed expenses but denial of similar claims with no evidence casting doubt on the accuracy of those disapproved other than the absence of a notation "for C&C Farms." It also does not address the special master's findings which were the result of his painstaking efforts to ascertain the partnership's business activities, including "tracing every check claimed by Eslinger as an unreimbursed expense to the original cancelled check and verified that the amount and payee were accurate." The trial court did not explain by reference to the record why some of Mr. Eslinger's claims were less credible than others. Thus, although the trial court chose to disregard the special master's finding in some respects, it did not determine the facts itself.

The only testimony about a specific expense that was discussed at the trial was a check written to Lane Thrasher for "hay." Mrs. Eslinger testified that she did not write the check, but that it was written by her secretary. She testified that she thought that it must have been for hay because that is what is said in the "for" line, but that Lane Thrasher did some trucking for them. In 1988, the Eslingers paid Mr. Thrasher $2,500 for trucking, and the record includes a number of checks to Mr. Thrasher for hauling or trucking. While Mr. Thrasher testified that he did not sell hay, he also stated that he did a lot of work for C&C and that the check in question could have been for trucking. He identified his signature on the endorsement.

The special master testified that Mr. Thrasher had been paid by the partnership through the C&C Farms account in the control of Mr. Parks on several occasions for trucking and hauling hay, a conclusion supported by the checks in the record. He surmised that the notation "for hay" could have been a misstatement and that the check in question could have been payment for hauling hay because Mr. Thrasher had been paid for similar trucking services and because the amount was in line with other payments by the partnership for his hauling services. This conclusion is supported by evidence in the record.

The significance of the single $375 check is not that it was disallowed, but that Mr. Parks used the notation as an example of improper expenses being claimed as partnership expenses by Mr. Eslinger. The trial court relied on this check as "the most telling example for the Defendants' credibility" simply because the notation said it was for hay and Mr. Thrasher did not sell hay. We

find no basis for the trial court's conclusion or for its disallowance of thousands of dollars of other claimed expenses because of a slight misstatement on one check.

Mr. Parks also objected to truck related expenses. The 4x4 truck was bought by the Eslingers for C&C Farms purposes because their personal truck proved unusable in traversing the farmland to check on the cattle. It was purchased with proceeds from the sale of C&C cattle. Mrs. Eslinger testified she used the truck to drive around the farm and count cattle, haul feed, and remove debris. The testimony indicates the Eslingers also used the truck for personal purposes at times. After the partnership was dissolved, the Eslingers kept the truck and then sold it for $3,250.

At trial, Mrs. Eslinger introduced documents supporting truck related expenses, and she deducted the $3,250 received from the sale of the truck from the claimed expenses. The special master approved a total of $4,349.24 in truck related expenses, but assigned a value of $4,480 to the truck when it was sold, which exceeded the total expenses approved, and charged that amount against the Eslingers. Mr. Parks objected to some of the approved expenses, although his objection does not exactly specify the charges he objects to. The precise wording of Mr. Parks's objection is relevant:

> Additionally, there were charges for the 1986 pickup that Mr. Eslinger kept when the partnership was terminated for items such as tires, stereo installation, lights, insurance, etc. totaling $2,974.07. **The Plaintiff acknowledges that the Court can attribute some of those expenses to the farming operation,** but questions the installation of a stereo, new transmission, and custom lighting additions as legitimate partnership expenses, especially when the Court contemplates that the Defendant drove the truck for personal use as well as for partnership business. Then again . . . the special master credits the Defendants with . . . an additional $911.58 for repairs to the truck taken by the Defendant.

The total of the truck related expenses mentioned in this statement is $3,885.65.[8] The relevant exhibits to the objection include payments for insurance, apparently routine maintenance, repairs, and equipment such as tires. Although Mr. Parks acknowledged that some of the expenses were properly attributable to the partnership, he did not precisely identify which charges he thought should be disallowed.

The Statement of the Evidence reflects the following testimony from the special master regarding the truck related expenses:

---

[8]The exhibits reflect $2,979.87 as the total of the 1989 expenses objected to although the motion lists that figure as $2,974.07. In addition, the documents attached to that exhibit total $2,952.93. Additionally, although Mr. Parks challenges $911.58 in truck related expenses in 1990, the special master's report reflects that he only approved $781.66 in such claimed expenses for that year.

-19-

The truck expense, such as transmission and custom lighting did not appear to be unreasonable and George Eslinger's personal use of the truck was offset by his personal payment for all gas. Moreover, the accounting utilized the book value for the truck when it appears that the market value of the truck was $1,500 less than book value. Again, the special master rejected all expenses which were not adequately documented.

Nonetheless, without taking additional proof regarding any of the challenged expenses, the trial court modified the special master's report by disallowing in full the total amount of expenses mentioned by Mr. Parks even though Mr. Parks did not actually object to the total amount. The truck related expenses were dealt with in the trial court's order as part of the other operational expenses and disallowed as not legitimate expenses of the partnership operation.

The special master treated the truck as a partnership asset, charging Mr. Eslinger with its value upon dissolution of the partnership. Although at trial Mr. Parks appeared to challenge whether the truck was partnership property, asserting it was titled to Mr. Eslinger, he has abandoned that argument.[9]

Mr. Parks acknowledged that some of the expenses allowed by the special master were properly chargeable as expenses of the farming operation. Because the truck was a partnership asset used in the cattle operation, we can find no basis for challenging most of the expenses charged, such as those for insurance, tires, repair, and maintenance. Those expenses are documented by invoices or receipts from the providers of the goods and services. The special master disapproved any expenses unsupported by documentation. Mr. Parks's objection is so vague as to those expenses he thinks are not proper charges to the partnership as to make it impossible to identify the amount or the basis for any particular charge. His argument seems to be that because Mr. Eslinger used the truck for personal purposes at times, some of the expenses should be deemed personal. However, he has not proved any particular usage, or percentage of usage, by the Eslingers for personal purposes. The special master stated that any personal usage would be offset by the amounts Mr. Eslinger spent on gas for partnership purposes, for which he did not make a claim.

We find that the evidence preponderates against the trial court's finding that $ 3,885.65 in truck related expenses were not legitimate expenses of the partnership. The evidence supports the finding of the special master which credited $4,349.24 in such unreimbursed expenses.

### B. Interest Payment

The special master originally credited Mr. Eslinger with $1,609.31 in interest he paid on loans. Mr. Parks objected to this allowance on the basis it represented an interest payment on a personal note, not a partnership debt. At the hearing on Mr. Parks's objections, the special master

---

[9]Mr. Parks identified the truck as a partnership asset in both the January 1990 and September 1990 agreements.

acknowledged he had incorrectly attributed a portion of the amount in question. The Statement of the Evidence recites:

> Mr. Parks asserts that the special master incorrectly gave credit to Mr. Eslinger for a check drawn on the account of G&T Farms on August 22, 1989, for $1,609.31. Mr. Parks claimed this was an interest payment on a personal note from George Eslinger to Middle Tennessee Bank for the principal sum of $15,000. Of the $1,609.31 in interest paid to the bank, $935.75 was interest on the $15,000 personal loan to Mr. Eslinger. The remaining $673.56 was interest on the disputed loan of $15,000 deposited into the C&C account on March 22, 1989. The special master determined that the $15,000 disputed loan was never loaned to Mr. Eslinger, but was, in fact a loan to the partnership. Therefore, Mr. Eslinger should be given credit for the $673.56 that he paid on behalf of the partnership loan.

The trial court held the $1,609.31 payment to the bank was an interest payment on the Eslingers' personal note. Again, the trial court based its conclusion on its determination that the Eslingers were not credible. The court made no finding that the "$15,000 disputed loan" referenced by the special master was a personal rather than a partnership debt. On appeal, Mr. Parks makes no argument specific to the interest payment.

We have reviewed the entire record and have found no note or other instrument evidencing a loan to Mr. Eslinger personally. A representative of the bank testified that Middle Tennessee Bank has no record of any loan to George Eslinger or Virginia Eslinger. She also testified that C&C Farms had three notes outstanding in September of 1990, and introduced those notes into evidence. They were all dated August 17, 1990, and the borrower on all was reflected as Joe Parks and George Eslinger d/b/a/ C&C Farms. They were in the amounts of $70,000, $86,501.51, and $57,500. They were renewal notes, and the bank employee introduced some of the notes immediately preceding the renewals, while Mrs. Eslinger introduced earlier ones. The $86,501.51 was the principal remaining on the original $112,500 used to buy the cattle. Mr. Parks testified that he had reduced the principal on that note to $86,000 using proceeds from the sale of C&C cattle prior to the opening of the C&C account because he had personally borrowed the initial purchase price.[10] The record reflects that the remaining principal was converted into a joint or partnership obligation by issuance of a note to both parties.

The $70,000 note is the result of the consolidation of several earlier notes, and it is in this history that we find reference to two $15,000 amounts. There were apparently two separate notes of $15,000, issued in January and in March of 1989. They were subsequently renewed and were combined into a note for $30,000. The record includes a $30,000 note to Joe Parks and George Eslinger dated August 18, 1989, signed on behalf of C&C Farms by Mr. Parks and Mr. and Mrs.

---

[10]The record includes a notice of loan maturity dated March 28, 1989, listing Gambill Farms as the borrower, the original note date as March 11, 1989, and showing a principal balance of $86,501.51.

Eslinger. The purpose of the note is stated to be "Refinance Business Loan."[11] An earlier note, dated January 23, 1989, for $15,000 also appears in the record. The borrowers on that note were Joe Parks and George Eslinger d/b/a/ C&C Farms. The record does not include any other note in the amount of $15,000, but Mrs. Eslinger introduced a chart showing various notes, their initiation, and interest payments. That chart includes a $15,000 note on March 22, 1989, which was later combined into the $30,000 note.

The objection herein relates to an interest payment made by the Eslingers on either the $30,000 note or the two $15,000 notes, and Mr. Parks maintained that the entire payment relates to personal loans of Mr. Eslinger. While there is no instrument indicating a personal loan of any amount to Mr. Eslinger, there was testimony that one of the $15,000 notes represents a loan from C&C to Mr. Eslinger to allow him to pay off a personal loan at another bank. Both Mr. and Mrs. Eslinger testified to that transaction, and neither claimed that the resulting partnership note was anything other than a personal loan. They deducted the $15,000 from their claim for reimbursement of expenses. Similarly, the special master deducted the balance of the note, $15,035, from the expenses claimed by the Eslingers. As noted above, he also corrected his original finding and attributed $935.75 of the interest payment to the personal loan.

With regard to another $15,000 note or loan, referred to by the special master and the trial court as a "disputed loan," it appears to have been mentioned first in testimony regarding the September, 1990 agreement, later voided by the jury's verdict. Under that arrangement, Mr. Parks was to get all the partnership assets and liabilities, except the Eslingers were to get the truck and to pay Mr. Parks $30,000. Although Mr. Parks directed the bank to prepare a note in that amount for the Eslingers' signatures, they never went to the bank to sign it.

Mr. Parks stated that the additional $15,000 he demanded in September of 1990 represented funds from the sale of cattle that had been deposited in Mr. Eslinger's account. The Eslingers disputed that assertion. After discussion among counsel and the court about the $30,000 demanded as part of the September 1990 arrangement, the court stated that the Eslingers were in agreement with $15,000 of the $30,000 Mr. Parks wanted out of the deal as a personal loan for which they, not the partnership, were liable. "The other fifteen thousand was just a figure that was eventually inserted in this written contract for them to pay." Thereafter, both counsel and the court referred to it as the "extra $15,000" or the "disputed $15,000."

Since the September 1990 agreement whereby Mr. and Mrs. Eslinger agreed to pay Mr. Parks $30,000 was voided, Mr. Parks cannot rely on that agreement to establish a personal, rather than partnership obligation, especially in view of the notes reflecting a joint obligation. The worksheet introduced by Mr. Parks's accountant, prepared from records obtained from Mr. Parks, lists one loan to George Eslinger, dated January 24, 1989, in the amount of $15,035. In our earlier opinion, based

---

[11]The record includes another note of the same date, signed by the same parties, also for the purpose of "Refinance Business Loan" in the amount of $40,000. Apparently, both of these notes were later consolidated into a note for $70,000.

upon the same evidence that was later before the special master, this court found that "In September, 1990, the partnership indebtedness was $214,000.00, including a personal loan of $15,000.00 to the Eslingers."

It is significant that, although Mr. Parks objected to the credit to Mr. Eslinger for the interest payment on the note, he did not object to the special master's deduction of only $15,000 as a personal debt. Without objection to the nature of the underlying debt, the objection to the crediting of one interest payment is without basis. Similarly, Mr. Parks did not object to the special master's reconciliation of the December 17, 1988 cattle sale and purchase transactions, which transactions are the factual predicate for Mr. Parks's assertion that the $15,000 represents money owed to C&C because Mr. Eslinger deposited some proceeds from that sale into nonpartnership accounts.[12] Thus, Mr. Parks has waived any objection based on an assertion that the Eslingers owed $30,000 rather than the $15,000 they acknowledged.

Although the special master's response addresses whether the loan was entirely personal or represented $15,000 in personal and $15,000 in partnership debt, another interpretation of Mr. Parks's original objection is that the interest payment was actually paid only on the personal loan. The special master found otherwise. Appearing in the record are note transaction statements from the bank, including one for a $15,000 note of January 23, 1989, numbered 102355, and one for a $15,000 note of March 22, 1989, numbered 1033239. Those statements show that they were paid off on August 23, 1989, (apparently renewed as the combined $30,000 note) with interest on the first of $935.75 and on the second of $673.56. These amounts coincide with the breakdown by the special master in his correction and the date of the payment.

Consequently, we find the evidence in the record supports the special master's revised finding regarding the interest payment and reverse that portion of the trial court's judgment reducing Mr. Eslinger's credit by the $673.56 interest payment on the partnership loan.

## C. Cattle

As discussed earlier, the partnership started out with the purchase of an existing herd of cattle. There were subsequent sales and purchases of cattle. After the September 1990 agreement, Mr. Parks took over the C&C herd, sold off some animals, and sold the entire remaining herd to

---

[12]There was testimony from all parties about a series of transactions in December of 1988 and January of 1989. At a Christmas sale of cattle at the Eslingers' cattle auction yard, C&C cattle were sold, and Mr. Parks's son, Steve, purchased cattle for C&C. In January of 1989, Mr. Eslinger met with Mr. Parks and Steve to reconcile the various transactions and deposits. Mr. Eslinger had deposited some of the proceeds from the sale of the cattle to his personal or auction business accounts. The special master did an analysis and "reconciliation of 12/17/88 cattle sale." He found that $49,204.85 was received in proceeds from the sale of C&C cattle and deposited into the Eslinger personal account; that Mr. Eslinger was entitled to a credit of $27,221.76 for cattle purchases for C&C and expenses; that Mr. Eslinger was entitled to a $7,000 credit for purchase of the truck on January 12, 1989; and that Mr. Eslinger had reimbursed C&C $14,324.70. The master found that the Eslingers owed C&C $658.39 as a result of the various transactions.

himself in November of 1990.  Because each party raised issues regarding the size of the herd and its value upon dissolution, the special master analyzed the purchases and sales.

The special master prepared a report detailing the number of animals in the herd on September 19, 1990, as verified by the records of the veterinarian who handled the testing on that date and testimony of the parties, the sales after Mr. Parks took over the herd, and the final sale.  He found that as of September 19, 1990, there were 258 animals in the herd, and his report breaks them down into categories.  This report coincides with Mrs. Eslinger's testimony that on the day of testing, 135 animals were tested, 23 heifers were not tested, and there were also approximately 100 calves. The special master found that 48 calves were sold September 20 and that Mr. Parks sold 38 more animals in October.  This left a total of 172 animals, of which presumably 47 were calves.  The special master also assumed that 75% of the cows reported to be in their last trimester of pregnancy in September had calved by the final sale, producing 32 additional calves.  One hundred twenty-five animals were sold in the November 28, 1990 sale, including 79 cow/calf pairs.  Thus, the total number of animals, counting calves separately as was done in the earlier calculations, was 204.  The special master valued the herd as of the date of the final sale, arriving at a total value of $97,935.

Neither party objected to the special master's count of the animals in the herd or his valuation.  Mr. Parks, however, objected to the master's report in one specific related to the cattle in the herd.  The objection was to a credit given to the Eslingers for the purchase of 32 head of cattle in the amount of $19,532.38.  The credit was specified as invoices attached as an exhibit to the objection.  Those invoices date from January through March of 1990 and were also included in the record as a collective exhibit to Mrs. Eslinger's testimony.

Mrs. Eslinger introduced and explained a summary, supported by various receipts and invoices, of cattle purchased by the Eslingers for the C&C herd in early 1990.  She testified, "And then in 1990, when we thought we were on our own with this, we were buying cattle and adding them to the herd. . . .  We wanted to get a young herd that was going to have lots of calves and be a successful venture."  The Eslingers claimed the purchase in 1990[13] for the C&C herd of 32 cows, 9 calves and 1 bull for a total price of $17,689.28.  The invoices attached to her summary total more than that, but she testified that not all of the cattle reflected on the invoices had been put in the C&C herd.  Thus, while the invoices attached to her claim, and subsequently attached to Mr. Parks's objection, total $19,532.38, the Eslingers only claimed $17,689.28 for cattle bought for and kept with the C&C herd which Mr. Parks eventually took control of and sold.

Thus, in responding to Mr. Parks's objection, the special master first pointed out that the credit in question was actually only for $17,689.28.  We agree that since the special master only credited the Eslingers with $17,689.28, an objection to a $19,532.38 credit cannot be sustained.

---

[13]Mrs. Eslinger testified that although the Eslingers had also bought cattle for the herd in 1989 they were not seeking reimbursement for those purchases.  The C&C records reflect that no payments were made out of the C&C account for cattle purchases after June of 1989.

Even though Mr. Parks mistakenly claimed an objection exceeding the credit actually given, the substance of his objection was that the Eslingers were not entitled to credit for the "32 head of cattle reflected on the invoices."[14] Mr. Parks first asserted that the 32 animals were "catch" cattle purchased by Mr. Eslinger as part of his livestock yard operation and that there was no evidence in the record to show these were actually C&C partnership cattle.[15] Mr. Parks argued that each transaction with Lewisburg Livestock should have included records revealing payment from the partnership to the auction yard and that no such documentation was included.[16] We first note that Mr. Parks kept the C&C checkbook the entire time, so there could have been no check from C&C written by the Eslingers. They would have paid for the cattle with money from either their personal or business accounts. Additionally, the real question is whether the cattle ended up with the C&C herd sold by Mr. Parks.

The Statement of the Evidence includes the special master's response to this objection:

Mr. Parks also asserts that there are no records or proof that Mr. Eslinger added the 32 head of cattle to the C&C herd. Mr. High testified that in Exhibits 22 and 23 there are several invoices for cattle that total $17,689.28. Included in Exhibit 23 is a check for $5,250 which matches one of the invoices contained in Exhibit 23. Mr. High also testified that there was sufficient documentation to show that Mr. Eslinger did, in fact, include the cattle into the partnership herd.

The claim by the Eslingers for the cattle purchased in 1990 is supported by various invoices, receipts, and checks. A review of the worksheet of C&C activity prepared by Mr. Parks's accountant shows payment from the C&C account for cattle purchased from September 1988 through June 12,

---

[14]The summary claimed 32 cows, 1 bull and 9 calves, and we assume Mr. Parks refers to all the cattle claimed.

[15]It is in this objection that Mr. Parks inserts the argument that the Eslingers had failed to keep records mandated by federal law in the operation of their livestock auction yard which the trial court used as basis for finding the Eslingers lacked credibility. He argued that the Eslingers failed to provide documentation of their purchases from the livestock yard "documentation which should have been readily available pursuant to Federal law" and their claims should not be given credence. The fact that the Eslingers did not introduce into evidence herein the documents Mr. Parks claims are required does not justify a conclusion that they failed to maintain records of their livestock auction business in accordance with the law.

[16]Mr. Parks's brief on appeal also states "Another request dealt with the failure of the Eslingers to support their claim for 32 head of cattle bought in 1990, after the January agreement. The only proof presented was Ex. #8, a check for $8,185.50." The record includes an Exhibit 8 to Mr. Parks's objections to the special master's report. That exhibit is, in its entirety, Exhibit 22 introduced at trial, through Mrs. Eslinger's testimony. That collective exhibit includes Mrs. Eslinger's listing of cattle purchased for C&C in 1990 and the invoices related to those cattle. The exhibit includes no check for $8,185.50. However, Exhibit 8 of the trial record is, in fact, a check for $8,185.50. The check was from Lewisburg Livestock Auction to C&C Farms and dated November 28, 1989. Obviously, a check to the partnership would not reflect a purchase by or for the partnership. In fact, Mr. Parks's accounts reflect a deposit of that amount on that date for the sale of cattle, and Mr. Parks testified that the check was deposited to his Gambill Farms account. Thus, the statement that the purchase of cattle was reflected by the single check unsupported by any other documentation is clearly erroneous. The referenced check was not for the purchase of cattle.

1989.  We find no more documentation in the record that these cattle were added to the herd or transported to the farm than exists for the purchases challenged by Mr. Parks.  The record supports the finding by the special master that the cattle claimed by the Eslingers were purchased by them at the amounts reflected in the invoices and receipts and were added to the herd.

The trial court found that:

> the thirty-two (32) head of cattle allegedly purchased for the partnership were in fact purchased for the Defendants' private cattle business known as Lewisburg Livestock Auction Co., as "catch" cattle and have no connection to this partnership.  There is no evidence in the record showing payment to Lewisburg Livestock Auction that supports a transfer to the partnership, nor is there any evidence in the record showing expenses for shipping these cattle to the partnership farm.  Federal law requires that the Defendants keep accurate and complete records of each and every transaction at the stockyard.  Their failure to do so, again, goes against their credibility and believability.  The value of these cattle, Twenty-three Thousand Seven Hundred Eighty-five Dollars and seventy-six cents ($23,785.76) should be credited to the Plaintiff.

The trial court modified the master's report by $23,785.76, which was not the amount the special master had credited to the Eslingers for cattle purchases in 1990.  Instead, it is the amount requested, under an alternative theory, as the value of 32 head of cattle.  Essentially, this second theory was that if the cattle originally objected to were actually added to the herd, they must have replaced other cattle not accounted for.  Mr. Parks asserted he was entitled to payment for the "missing" 32 head of cattle.  In his brief, Mr. Parks states, "If in fact those 32 head of cattle shown in Exhibit 22 [Mrs. Eslinger's listing of cattle bought for the C&C herd in 1990] were the Eslingers' cattle, that means the C&C herd had dwindled from 228 head [the initial herd] to only 87 head.  Mr. Parks had lost 141 head of cattle over the life of the partnership. . . ."

Disregarding Mr. Parks's characterization of partnership assets as his own,[17] we find his statements unconvincing.  First, the herd on September 20, 1990 included 258 animals.[18]  Mr. Parks was aware of or conducted subsequent sales, and the proceeds were included in C&C's assets.  Second, there were numerous sales, as well as purchases of cattle throughout the existence of the partnership.  Mr. Parks's own records reflect proceeds from the sale of cattle of $297,377.23 before he bought the remaining herd after terminating the partnership.

More specifically, the worksheet prepared by Mr. Parks's accountant includes entries for deposits from a number of sales of cattle between the January 1990 arrangement which was to have

---

[17]This characterization relates to his reliance on the security agreement and his claim for a deficiency judgment.

[18]Mr. Parks did not object to the master's findings regarding the number of animals in the herd in September of 1990.  The number is also reflected as 125 or 129, which is a count based on counting cow/calf pairs as one animal.  We do not know how the original herd number was calculated.

given the Eslingers sole control and the assets of the partnership and the September 1990 arrangement under which Mr. Parks took control of the herd. During that time period, a total of eleven such deposits were made, totaling $62,202.27. We have no information about the number of cattle involved in each sale.

The Statement of the Evidence includes the following with regard to this issue:

Mr. Parks asserts that the same 32 head of cattle were actually missing from the herd. Here, again, the special master noted that there were few records of cattle bought, some records of cattle sold, and virtually no records of calves born, dying, or stolen. Mr. High testified that there were no records to indicate that the cattle were sold by Mr. Eslinger. Here, again, Mr. High testified that due to the poor recordkeeping, nobody knows how many head of cattle were in the herd at any time prior to September 1990. Furthermore, since both Joe Parks and Steve Parks agreed that there were approximately 125-130 head of cattle in the herd in November, 1990, Mr. Parks's argument does not make sense mathematically.

There is no evidence in the record to show that 32 head of cattle were somehow disposed of by Mr. Eslinger without the proceeds going to the partnership. The records regarding sales and purchases are not specific as to numbers of animals so as to reach the conclusion urged by Mr. Parks. The records do show credits to the partnership for cattle sales during the time in question, i.e., after the January 1990 arrangement, as well as sales before that time. Mr. Parks simply did not prove that 32 cattle or any other number of cattle were removed or missing from the partnership herd without the proceeds going to the partnership. Without evidence that cattle were, in fact "missing," Mr. Parks's claim for the value of a specific number of missing cattle cannot be sustained.

## VII. Costs

The parties dispute who should pay the costs of the special master. The trial court determined that Mr. Parks had prevailed in the lawsuit and, therefore, Mr. Eslinger should pay the costs, including those attributable to the special master. Of course, the trial court awarded Mr. Parks over $45,000 more than the special master determined was the balance of debits and credits between the former partners, and we have reversed that award. Mr. Eslinger argues that the fact that the final accounting as stated by the special master showed that Mr. Eslinger owed Mr. Parks approximately $10,000 does not mean that Mr. Eslinger prevailed in the case. He also argues that Mr. Parks should be charged with the special master's costs because it was Mr. Parks's wrongful conduct which caused the situation requiring an accounting.

Tenn. R. Civ. P. 53.01 provides, in pertinent part:

The compensation to be allowed to a master shall be fixed by the court, and shall be charged upon such of the parties or paid out of any fund or subject matter of the action, which is in the custody and control of the court as the court may direct.

Special master fees are often taxed as part of the costs. *See, e.g., French v. Appalachian Elec. Coop.,* 580 S.W.2d 565 (Tenn. Ct. App. 1978). However, such fees may also be assessed separately, or differently, from other costs. *See, e.g., Manis*, 49 S.W.3d at 299 (trial court taxed fees of the special master 1/3 to wife and 2/3 to husband, and no modification was made on appeal).

The taxing and assessing of costs by the trial court, including fees for a special master and costs associated with proceedings before a master, rests in the discretion of the trial court. *Long*, 957 S.W.2d at 833-34. Nonetheless, appellate courts have modified the apportionment of costs for special masters where the circumstances of the case required it. For example, in *Long*, the trial court allocated the special master's fees equally among the parties based on its finding that "the services of the special master, inasmuch as they involve evaluation and division of the parties' assets in the case of the parties own inability to do so, should be deemed to have inured to the benefit of each of them equally." *Id.* at 833.

This court disagreed because the divorce proceedings and the proceedings before the special master were brought about by the husband's conduct. Of significance was the husband's egregious behavior in dissipating and/or secreting the parties' marital assets, because two of the hearings before the master involved the issue as to what assets had been secreted or dissipated by the husband. Two other reports by the master were objected to by the husband, causing additional or further hearings, which generated additional fees. The special master found the husband had no basis for any of the positions taken in the objections. Based upon these circumstances, this court modified the trial court's assessment of the fees and charges involving the special master's proceedings, charging 85% to the husband and 15% to the wife.

We are not convinced that assessment of the costs of the master herein should be determined under the prevailing party theory. Both parties herein have argued extensively that the other was responsible for the failure of the partnership and/or the losses sustained. Mr. Parks originally brought this lawsuit asking for a deficiency judgment for amounts owing to the bank after the partnership assets were sold and the trial court awarded him $90,735.39. That judgment was vacated by this court which noted that it did not apparently take into account moneys deposited to Mr. Parks's Gambill Farms account which should have gone to the partnership or counterclaims by the Eslingers. Mr. Parks also originally brought this lawsuit partially on the basis of an agreement that was voided by the jury because they found, contrary to Mr. Parks's testimony and consistent with the Eslingers' testimony, that the Eslingers had been coerced into signing away their rights in the partnership assets. The case was remanded for the taking of an accounting of the partnership affairs. The fact that the accounting resulted in a finding that Mr. Eslinger owed Mr. Parks $10,000 does not convert an accounting into a finding of liability on any of the theories set forth by Mr. Parks.

Whether or not Mr. Parks can accurately be said to have prevailed in the lawsuit, the costs of the special master should be allocated in accordance with the principles applied in *Long*. The partnership, as a business operation, was effectively terminated with the sale of the cattle. Thus, while both parties argue that the other was at fault in various ways, the real issue to be determined, and that which was determined by the special master, was how much money the partnership earned

or lost and what liabilities existed between the partners for such losses. As GIBSON'S has explained, a reference to a master is necessary when it is necessary to take and state an account between the parties, covering numerous items. GIBSON'S, *supra*, at §245.

Accordingly, we conclude that the costs of the special master should be divided between the parties equally.

## VIII. Mr. Eslinger's Counterclaims

On appeal, Mr. Eslinger requests this court to find that his counterclaim is well-taken, based essentially on findings by the special master, to award compensatory damages on that counterclaim, and to remand for an award of punitive damages. In our earlier opinion remanding the case for an accounting of the partnership affairs, we stated that the findings and recommendations of the special master "should also include the allegations in the counterclaim." *Parks*, 1994 Tenn. App. LEXIS 497, at *3.

Mr. Eslinger's counterclaims were based upon assertions that Mr. Parks had breached his original agreement to provide financing, had breached the January 1990 agreement, should it be determined to be valid, by nonperformance, and had wrongfully seized and sold assets of the partnership, all causing financial damages to the Eslingers. The counterclaim further asserted that Mr. Parks had engaged in outrageous conduct and asked for punitive damages. The conduct cited was: (1) draining the assets of the partnership for his personal benefit by depositing C&C money into his personal business account and using C&C funds for expenses chargeable to his other business; (2) manufacturing an additional $15,000 debt owed by Mr. Eslinger and attempting to coerce the Eslingers to agree to pay it; (3) coercing the Eslingers to relinquish their control over the remaining partnership assets; (4) manufacturing a default under the September 1990 agreement to justify a foreclosure under the January 1990 agreement so as to gain sole ownership of the business; (5) manufacturing a default under the January 1990 agreement by failing to apply C&C funds to interest payments due on October 15, 1990; and (6) arranging for a minimally-advertised cattle auction and purchasing the cattle himself for a discounted price.

Mr. Eslinger's petition for a special master cited this court's remand language and requested that the special master be appointed to make findings and recommendations concerning Mr. Eslinger's counterclaim. Mr. Elsinger then dismissed his petition. Mr. Parks then asked the trial court to appoint a special master to "assist the Court in reaching a determination as to the rights and responsibilities of the parties to this cause, to enable the Court to enter a judgment or further direct that additional proof be presented at trial as necessary." The trial court, in its order appointing a special master requested only an accounting of the testimony, records and exhibits and did not specifically address Mr. Eslinger's counterclaims.

After the special master's report was filed, Mr. Eslinger filed a response to Mr. Parks's objections to the report wherein he stated he "accepts the conclusions of the Report at this juncture of the proceedings as asks the Court to adopt them." He did not raise the issue of the counterclaims

at that point as an objection to the master's report. According to the record, neither did he ask the trial court to rule on the counterclaims. The final order does not address the counterclaims separately, but modifies the special master's report and assesses costs.[19]

A portion of Mr. Eslinger's counterclaim was for compensatory financial damages relating to Mr. Parks's deposit of C&C money to his other accounts, use of C&C money for non-partnership purposes, and his failure to provide the financial support in terms of reimbursing the Eslingers for expenses or to use money from the sale of C&C cattle to reduce indebtedness. All these issues were dealt with in the special master's accounting. In his brief, Mr. Eslinger states:

> Although the Special Master did not specifically make findings and recommendations on George Eslinger's counterclaim, the Special Master did find that Joe Parks converted over $90,000 in corporate assets, and retained over $40,000 of these assets for his private purposes. . . . Based on these findings and the state of the record at this juncture, George Eslinger requests this Court to make express what the Special Master implied - that George Eslinger's counterclaim is well-taken.

Without the characterizations assigned to Mr. Parks's conduct in this excerpt, we agree with the proposition that the special master accounted for moneys due from Mr. Parks to the partnership as well as money due Mr. Eslinger from the partnership. Consequently, we agree with Mr. Parks that the special master provided findings and recommendations on the compensatory damages portion of Mr. Eslinger's counterclaim.

Mr. Eslinger's original counterclaim also included a claim for outrageous conduct and sought punitive damages. Whether Mr. Eslinger established by proof the elements of outrageous conduct is a question for the court, not the special master. However, Mr. Eslinger never asked the trial court to make such a ruling, to take evidence on the issue or on the amount of punitive damages, if any, or to direct the special master to conduct a hearing on facts related to the claim or the amount of punitive damages.

Generally, this court will not entertain an issue on appeal that was not raised in the court below. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991) (citing *Lovell v. Metropolitan Gov't*, 696 S.W.2d 2 (Tenn. 1985)); *Davis v. Tennesseean,* 83 S.W.3d 125, 127 (Tenn. Ct. App. 2001); *Harlan v. Hardaway*, 796 S.W.2d 953, 957 (Tenn. Ct. App. 1990). Numerous Tennessee cases hold that an issue raised for the first time on appeal is waived. *See, e.g., Norton v. McCaskill*, 12 S.W.3d 789, 795 (Tenn. 2000); *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983) (noting, "It has long been the general rule that questions not raised in the trial court will not be entertained on appeal . . . "). An issue not presented to, decided, or dealt with by the trial court will not be considered by appellate courts. *In re Adoption of a Female Child*, 42 S.W.3d 26, 32 (Tenn. 2001); *Reid v. State*, 9 S.W.3d 788, 796 (Tenn. Ct. App. 1999).

---

[19]The trial court's earlier order after the trial had specifically denied the counterclaims. Of course, that order was vacated by this court's subsequent decision.

Because Mr. Eslinger did not present to the trial court the issue of his outrageous conduct claim and any punitive damages therefrom and did not give the trial court the opportunity to rule on the counterclaims before entry of judgment, he has waived that issue and this court will not consider it on appeal. *See also* Tenn. R. App. P. 36 ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Accordingly, we decline to grant Mr. Eslinger the relief he requests with regard to his counterclaim for outrageous conduct.

## IX. Conclusion

We reverse the trial court's modification of the special master's report and modify the award to Mr. Parks, as corrected by the special master. After that correction is made, Mr. Eslinger owes Mr. Parks $10,519.17. We affirm the portions of the report concurred in by the trial court. We modify the assessment of the costs of the special master and assess those costs equally between the parties. No modification is made to the trial court's award of other costs. The costs of this appeal are taxed to the appellee, Joe H. Parks.


_____
PATRICIA J. COTTRELL, JUDGE